Electronically Filed
Intermediate Court of Appeals
CAAP-16-0000630
22-JAN-2020
10:06 AM

NO. CAAP-16-0000630


IN THE INTERMEDIATE COURT OF APPEALS

OF THE STATE OF HAWAI'I


STATE OF HAWAI'I, Plaintiff-Appellee, v.
MATTHEW K. WILLIAMS, Defendant-Appellant


APPEAL FROM THE CIRCUIT COURT OF THE FIRST CIRCUIT
(CR. NO. 14-1-0589)


MEMORANDUM OPINION
(By: Fujise, Presiding Judge, Leonard and Wadsworth, JJ.)

Defendant-Appellant Matthew K. Williams (Williams) appeals from the September 14, 2016 Judgment of Conviction and Sentence entered by the Circuit Court of the First Circuit (Circuit Court).[1] After a jury trial, the Circuit Court convicted Williams of one count of Sexual Assault in the First Degree (SA One) in violation of Hawaii Revised Statutes (HRS) § 707-730(1)(c)(2014),[2] and three counts of Sexual Assault in the

---

[1] The Honorable Glenn J. Kim presided over sentencing. The Honorable Karen S.S. Ahn presided through trial.

[2] HRS § 707-730(1), provides, in relevant part:

**Sexual assault in the first degree**

(1) A person commits the offense of sexual assault in the first degree if:

. . . .

(c) The person knowingly engages in sexual penetration with a person who is at least fourteen years old but less than sixteen years old; provided that:

(i) The person is not less than five years older than the minor; and

(continued...)

Third Degree (SA Three), in violation of HRS § 707-732(1)(c) (2014).[3]  In Count 1, Williams was sentenced to twenty years

---

[2](...continued)

> (ii) The person is not legally married to the minor;

HRS § 702-206 (2014), provides, in relevant part:

**Definitions of states of mind**

. . . .

(2) "Knowingly."

> (a)  A person acts knowingly with respect to his conduct when he is aware that his conduct is of that nature.

> (b)  A person acts knowingly with respect to attendant circumstances when he is aware that such circumstances exist.

HRS § 707-700 (2014) (modified 2016), then extant, provided in relevant part:

> "Sexual penetration" means:

> (1)  Vaginal intercourse, anal intercourse, fellatio, deviate sexual intercourse, or any intrusion of any part of a person's body or of any object into the genital or anal opening of another person's body; it occurs upon any penetration, however slight, but emission is not required.  As used in this definition, "genital opening" includes the anterior surface of the vulva or labia majora; or

> (2)  Cunnilingus or anilingus, whether or not actual penetration has occurred.

> For purposes of this chapter, each act of sexual penetration shall constitute a separate offense.

[3]    HRS § 707-732(1), provides, in relevant part:

**Sexual assault in the third degree**

(1) A person commits the offense of sexual assault in the third degree if:

> . . . .

> (c)  The person knowingly engages in sexual contact with a person who is at least fourteen years old but less than sixteen years old or causes the minor to have sexual contact with the person; provided that:

> > (i)  The person is not less than five years older than the minor; and

> > (ii)  The person is not legally married to the minor;

(continued...)

incarceration, and in Counts 2-4 five years incarceration each, with all sentences to run concurrently.

On appeal, Williams contends: (1) the Deputy Prosecuting Attorney (DPA) committed prosecutorial misconduct before and during trial and in closing arguments; (2) the Circuit Court erred by permitting testimony of out-of-court statements; (3) the Circuit Court erred by permitting Alexander J. Bivens, Ph.D. (Dr. Bivens), to testify; (4) the Circuit Court erred by failing to grant his Motion for Judgment of Acquittal or his post-trial Motion for a New Trial because there was insufficient evidence of the dates of the offenses; and (5) the Circuit Court erred by limiting the number of Williams's character and reputation witnesses.[4]

---

[3](...continued)
HRS § 707-700 (2014) (modified 2016), then extant, provides in relevant part:

> "Sexual contact" means any touching, other than acts of "sexual penetration", of the sexual or other intimate parts of another, or of the sexual or other intimate parts of the actor by another, whether directly or through the clothing or other material intended to cover the sexual or other intimate parts.

[4] Williams's points of error are in wholesale non-compliance with Hawai'i Rules of Appellate Procedure (HRAP) Rule 28(b)(4), which requires that the opening brief contain a section stating the points of error in the following manner:

> Each point shall state: (i) the alleged error committed by the court or agency; (ii) where in the record the alleged error occurred; and (iii) where in the record the alleged error was objected to or the manner in which the alleged error was brought to the attention of the court or agency. Where applicable, each point shall also include the following:
>
> > (A) when the point involves the admission or rejection of evidence, a quotation of the grounds urged for the objection and the full substance of the evidence admitted or rejected:
>
> > . . . .
>
> > (C) when the point involves a finding or conclusion of the court or agency, either a quotation of the finding or conclusion urged as error or reference to appended findings and conclusions[.]
>
> Points not presented in accordance with this section will be disregarded, except that the appellate court, at its option, may notice a plain error not presented. Lengthy parts of the transcripts that are material to the points presented may be included in the appendix instead of being quoted in the point.

(continued...)

3

I.

On March 14, 2014, minor male T.Y. reported sexual abuse to school officials, the officials notified his father, T.Y. told his father Williams abused him, and the family filed a police report. On March 21, 2014, HPD Detective Scott Sato (Detective Sato) conducted a forensic interview with T.Y. In the interview, T.Y. reported two distinct incidents of abuse two years prior by Williams. On April 9, 2014, Williams was charged by Grand Jury of the foregoing four counts of sexual abuse.

On April 11, 2016, the Circuit Court heard motions in limine. Williams argued that the disclosure to friends within months of the incidents was not delayed reporting. The State responded that it believed the delay was a year, but even if it was less, delayed reporting was still relevant. The Circuit Court agreed that delayed reporting was beyond the ken of the jury, but required the State to lay a foundation as to Dr. Bivens's expertise with male children aged fourteen to sixteen.

Williams's second motion in limine sought to exclude T.Y.'s out-of-court statements to friends about the abuse. The Circuit Court ruled, "I'm not going to permit it. They're hearsay. Unless the government can come up with a hearsay exception, we litigate the matter outside the presence of the jury, but generally I'm not going to allow it." The State requested the court to permit the witnesses to testify to the changes in behavior that they saw in their friend. The court granted the request, "I think they can testify to what is relevant in terms of what they saw and--what they saw and heard, not meaning statements."

On April 15, 2014, the Circuit Court heard the State's motion in limine. The court agreed to permit character witnesses

---

[4] (...continued)

Counsel is reminded that noncompliance with the rules may result in sanctions, including disregard of the offending points of error. Nevertheless, because this court follows a policy of "affording litigants the opportunity 'to have their cases heard on the merits, where possible,'" we therefore consider Williams's points on the merits to the extent possible. Marvin v. Pflueger, 127 Hawai'i 490, 496, 280 P.3d 88, 94 (2012) (quoting Morgan v. Planning Dep't, Cnty. of Kauai, 104 Hawai'i 173, 180-81, 86 P.3d 982, 989-90 (2004)).

Williams's points have been reordered and restated for clarity.

to testify to Williams's nonviolent character, but reserved ruling on evidence of reputation for honesty for review of case law and further argument.

On May 3, 2016, opening statements were presented. The State opened with a description of the two incidents of abuse, and referenced T.Y. telling two friends about the incidents. Williams objected and the Circuit Court limited the State to stating T.Y. "talked to two friends." Later, the State mentioned a computer message sent by T.Y. to minor female S.S. Williams objected and the court struck the reference. Williams's opening statement outlined that T.Y.'s friendship had been rejected by Williams's daughter, minor female J.W., and argued T.Y. was fabricating these allegations in retaliation. Williams emphasized that the case would come down to whether the jury believed T.Y. or Williams.

The State called nine witnesses, including: Detective Sato, T.Y.'s father (Father), childhood friend and neighbor, S.S., HBA teacher Louise Keyes Logan (Logan), HBA school guidance and college counselor Tara Gruspe (Gruspe), T.Y's camp counselor C.O., T.Y.'s mother (Mother), T.Y., and Dr. Bivens.

Detective Sato conducted the March 21, 2014 interview with T.Y. T.Y. was sixteen at the time of the interview and fourteen at the time of the alleged incidents. The police report was made on March 14, 2014. T.Y. discussed two incidents of assault but could not give specific dates. The first incident he placed during his March 2012 spring break. Detective Sato determined the dates by reference to the school calendar as March 9, 2012, to March 26, 2012. The second incident T.Y. placed a few months after the first over a three-day weekend of which there were three: Good Friday, Memorial Day, and Kamehameha Day. T.Y. described the abuse as taking place in the bathroom of the Williams home. Detective Sato identified Williams and stated that Williams was at least five years older than T.Y. On cross-examination, Detective Sato indicated that he discounted Good Friday as the date of the incident because it was too close to the alleged first incident.

5

Father testified that T.Y. and J.W. had a close "like a brother-sister relationship," that T.Y. had considered the Williamses to be a second family, and that T.Y. would play games with Williams and his wife. A school official informed Father about a sexual assault on T.Y. On the drive home, T.Y. indicated that Williams was the perpetrator. The family decided to file a police report. Father then testified to changes in T.Y.'s behavior around the time of the alleged abuse. First, that T.Y. stopped spending any time at the Williams home. Second, that a month or six weeks later T.Y. started spending time with the family again. T.Y. stopped again and then "really went into his shell." Father related that T.Y. would go straight into his room after school, stopped participating with his family, barely ate, and started wearing a hoody sweatshirt all the time.

Father, a roofer, also testified that Williams had wanted him to check out a job on their beach house but insisted on riding in the car with him, which Father thought was unusual. Father stated, "So we got down to the house, and all the way down all he could talk about was [T.Y]." Williams objected and the court sustained the objection. After further objections to the substance of Williams's statements, Father testified that there was not much of a roofing problem and that Williams just took a ride out to Lā'ie with him. Father also looked through his phone records and indicated that Williams had called his son's cell phone. On cross-examination, Father indicated that he believed that Williams had called T.Y. after the first incident and convinced him nothing would happen again.

S.S. testified that she had been friends with T.Y. and J.W., but she grew apart from them. From living in the neighborhood, S.S. could see at some point T.Y. and J.W. suddenly stopped spending time together. Later, S.S. noticed T.Y. was acting like a hermit and tried to draw him out. S.S. asked why he and J.W. stopped being friends. S.S. began to testify as to what T.Y. had said when Williams objected. The court permitted S.S. to testify as to the changes that she observed in T.Y., his emotional state, and that he typed a message to her. S.S.

described T.Y. being upset while typing a message on the computer explaining why he and J.W. were not friends anymore.

Logan, T.Y.'s former Spanish teacher, testified that during Christian Emphasis Week at School, T.Y. disclosed the abuse. Pursuant to the theme of Christian Emphasis Week of removing "masks" T.Y. stated, "I don't want to wear a mask anymore." T.Y. disclosed that a family friend had touched him inappropriately and Logan alerted Gruspe.

Gruspe, T.Y.'s Guidance Counselor, testified that T.Y. told her about two incidents. First, where his neighbor reached into the shower and touched him, afterward the neighbor told T.Y. not to tell anyone and that it would not happen again. Second, where the neighbor told T.Y. to wash him and then touched T.Y. Gruspe explained that T.Y. had become more solitary as he transitioned from middle to high school. On cross-examination, Gruspe testified that T.Y. had described his estrangement from J.W.

C.O. testified that he knew T.Y. from School, was older than T.Y., and had been T.Y.'s camp counselor. C.O. testified that during Christian Emphasis Week, T.Y. shared what had happened about a year earlier. C.O. stated that T.Y. was confused about what to do, and that he got very serious when telling him what happened. C.O. believed that he was the first person that T.Y. told.

Mother testified that T.Y. and J.W. were close neighborhood friends. About three and a half or four years prior to trial, Mother testified that T.Y. stopped spending time outside and became more solitary. Mother noted that this change coincided with T.Y. no longer going to the Williamses' home.

T.Y. testified that he had never been married and was a senior at School. T.Y. explained Christian Emphasis Week at School is where students take reduced academic classes and focus on religious matters. T.Y. testified to his friendships with C.O., S.S., and J.W. T.Y. detailed that J.W.'s parents treated him almost like a son, and that he would eat meals and play games with them.

During spring break 2012, T.Y. believed he stayed at J.W.'s home. T.Y. stated he was upstairs taking a shower to get ready for bed. T.Y. related that he entered the bathroom, turned on the lights, took off his clothes, and closed but did not lock the door. "As I was taking a shower, Matthew Williams came into the room or the washroom, opened the curtain, and put his hand on my penis and began to stroke it." T.Y. declared he did not know what to think, was overwhelmed, felt uncomfortable, and asked Williams what he was doing. Williams then apologized and took his hand off of T.Y.'s penis. T.Y. explained that he stayed over that night because he believed Williams's apology, but did not tell anyone because it was embarrassing and he did not think it would happen again.

During the second incident, T.Y. explained that while the Williams family stayed at their beach house, T.Y. pet-sat for them. T.Y. placed it in time as after the first incident over a three-day weekend. Williams was showing T.Y. where the spare key was when Williams asked if T.Y. "could go upstairs and wash his back." Only Williams had come back from the beach house. T.Y. thought it was a strange question and felt uncomfortable, but said yes because he did not feel like he could say no. T.Y. described the incident:

> So we go into the bathroom, and he takes off his clothes and gets in the shower and turns the shower on. And he gives me a washcloth to wash his back with, and as I'm washing the top of his back, he tells me to go lower and lower until I'm washing his butt. And then he turns around and asks me to wash his chest, and I wash his chest and tells me to go lower and lower until I'm washing his penis.
>
> . . . .
>
> His penis got hard.
>
> . . . .
>
> [Williams] told me to take off my clothes and got on his knees and sucked my penis.

T.Y. explained that he was overwhelmed and did not know what to think. After Williams stopped, T.Y. put his clothes on and left, and Williams called after him, "'You and me forever. You and me for life.'" T.Y. did not tell anyone and felt guilty and embarrassed, like he had done something wrong.

T.Y. then testified that Williams had called him between the first and second incidents to apologize. Williams also asked T.Y. not to tell his parents because Father might retaliate and authorities would take away Williams's kids. Initially, T.Y. listened to what Williams asked, but later told C.O. about Williams--but did not remember when--then told S.S., and then Logan. T.Y. then detailed his disclosure to Logan, which was prompted by Christian Emphasis Week's message of removing masks. T.Y. then told Gruspe, who contacted his parents. T.Y. spoke with an officer and a detective.

On cross-examination, T.Y. acknowledged that he participated in a videotaped interview with Detective Sato on March 21, 2014. T.Y. was questioned about details of the video that he could not remember. He was also asked about the time frame for the second incident and he responded as follows:

> [Williams's Counsel]: Well, do you think that the second incident could have taken place, for example, in April, that soon?
>
> [T.Y.]: It could have.
>
> [Williams's Counsel]: Could have taken place in May?
>
> [T.Y.]: It could have.
>
> [Williams's Counsel]: June?
>
> [T.Y.]: Could have.
>
> [Williams's Counsel]: July?
>
> [T.Y.]: No.
>
> [Williams's Counsel]: And you said it was over a three-day weekend; is that correct?
>
> [T.Y.]: Yes.

T.Y. was then confronted with a prior inconsistent statement about the time of Williams's calls to T.Y., that T.Y. had previously stated took place after the second incident, rather between the first and second. T.Y. stated he did not remember what he had told Detective Sato. When questioned about the calls, T.Y. stated that he had looked at the phone bill and had not seen records of the calls. T.Y. also agreed that Logan was not the first person he told, but if he had told her that, "I

told my friends, but I didn't really count that as telling an adult[.]"

The State recalled Father to testify to T.Y.'s phone records, State's Exhibit 16. The records indicate there was a phone call by J.W. at 9:50 p.m. on March 10, 2012 and then a call from Williams's phone at 9:54 p.m. On cross-examination, Father identified frequent calls and texts between T.Y. and J.W. in December 2011, January 2012, and February 2012, but fewer calls in March 2012, and no calls by the end of April 2012. The phone records were admitted into evidence as State's Exhibit 16.

Dr. Bivens testified that he is a clinical psychologist licensed to practice in Hawai'i with a private practice on Kaua'i. Dr. Bivens detailed his education, field work, and clinical experience, including that his practice focuses on teenagers. Dr. Bivens further discussed his specialization in child sexual abuse, training that he has conducted, and his research of scientific literature. The State offered Dr. Bivens "as an expert in clinical psychology with an emphasis on the dynamics of child sexual abuse." Williams did not object.

Dr. Bivens testified that he had not examined T.Y., but was informed that "the complainant is of male gender and is of some early teenage age." Williams frequently objected to the form of questions about the literature that Dr. Bivens relied on for his opinions. Dr. Bivens testified that teenaged children typically delay disclosure, that the delay can be years or for the majority at least one month. Dr. Bivens discussed the reasons from retrospective studies that children delay are typically shame and for boys fear of being "accused of being gay[,]" fear of upsetting their parents, being blamed for the abuse, concerned about consequences for the abuser, and that talking about it will be painful. Dr. Bivens indicated that the male children are less likely to disclose and are more likely to delay. Dr. Bivens further testified that he does not know T.Y. or Williams.

On cross-examination, Dr. Bivens testified that he had first been contacted about this case five weeks earlier. Dr. Bivens affirmed that he had been called by the State over seventy

times, had always testified for the State in criminal cases, and was paid $1600 plus expenses. Dr. Bivens asserted that psychological assessment could not determine with any degree of certainty whether abuse occurred.

Williams moved for judgment of acquittal on the basis of insufficient evidence of the charged date of the offenses, which the court denied. Williams and the State stipulated to Williams' date of birth. The State rested.

Williams presented seven witnesses in his defense, including his wife, Kathy Williams (Kathy), daughter J.W., son, Joshua Williams (Joshua), himself, Hawaii Youth Opera General Manager Malia Ka'ai-Barrett (Ka'ai-Barrett), minor female and best friend of J.W, A.B., and friend and accountant Laura Morgan (Morgan). Williams also played Detective Sato's videotaped interview with T.Y. in its entirety.

Kathy testified that she and Williams have been married for twenty-five years and they have two children; both children frequently had male and female friends over; that T.Y. and J.W. had been very close but grew apart slowly; that Williams had never expressed interest in adolescent boys or viewed male child pornography; that T.Y. had come to the beach house twice; the last time T.Y. pet-sat was over Presidents' Day weekend in February 2012; that she warned the kids about sexual abuse and being alone with adults unsupervised; and that Williams had no history of violence. On cross-examination, Kathy acknowledged that T.Y. trusted the Williams family and thought of them as second parents; that T.Y. only pet-sat once over Presidents' Day weekend 2012; she reviewed her Verizon phone records and saw that Williams's cell phone called T.Y.'s number on March 10, 2012, and three times on April 5, 2012.

J.W. testified that she met T.Y. through S.S.; she and T.Y were very close; T.Y was more introverted; that video games had been an issue in their friendship; they would stay in touch by texting and calling; T.Y. was uncomfortable spending time with Joshua and his friends at the beach house and that T.Y. argued with her aunty; that T.Y. pet-sat one time over Presidents' Day weekend 2012; she and T.Y. stopped being friends mid-March 2012;

11

her father had never acted inappropriately toward her; she had never received reports of inappropriate behavior by Williams from her friends; and Williams was non-violent. On cross-examination J.W. agreed that: she had reviewed her phone records and that she was texting or calling T.Y. on March 11, 12, 15, 16, 21, 31, and April 5, 2012; and that she had talked with her family about the case prior to coming to court.

The parties also discussed presentation of other witnesses. To support its theory of the case, the defense sought to establish T.Y.'s November 2011 visit to the Williamses' beach house as the beginning of the end of J.W. and T.Y.'s friendship. As such, he wished to present two boys, T.H-S. and K.T., to establish their teasing T.Y.; one girl, A.B., to show that T.Y. was jealous of J.W.'s other friendships, and one woman, Morgan, to testify to T.Y. acting out at the beach house. The court excluded the testimonies of T.H-S. and K.T. as irrelevant, permitted A.B., and took Morgan under advisement. Defense counsel also wanted to present Ka'ai-Barrett to testify as to Williams's conduct as a volunteer around children, which the court permitted. Counsel also wished to introduce Joshua's testimony to show his father was not violent, that he brought boys to the home and there were no reports of inappropriate behavior, and as to the events at the beach house. The court permitted Joshua to testify over an objection that it was cummulative because "this is a boy" rather than another adult or minor female. Counsel predicted the DPA would argue that family members would be biased, and that he should therefore be permitted to bring in one of Joshua's friends. The court denied this request.

Joshua testified that they celebrated his first deployment at the beach house and that T.Y. felt left out; J.W. and T.Y. were close; he never received complaints about Williams's behavior; Williams never did anything inappropriate to him; and his father was non-violent.

Williams testified that he had chaperoned for the Hawaii Youth Opera Chorus for fifteen years and around thousands of children; his home was always open to his children's friends

12

and there were no complaints about his behavior; he has never been sexually attracted to males or adolescent boys, or interested in child pornography; he never touched T.Y.'s penis or engaged in other sexual acts; he never said "You and me forever" to T.Y.; and that he never called T.Y. to apologize to him. On cross-examination, Williams acknowledged that there had been a March 10, 2012 phone call to T.Y. from his phone; three April 5, 2012 calls to T.Y.'s phone; and T.Y. was treated like a member of the family.

T.Y.'s statements in the March 21, 2014 videotaped interview by Detective Sato were substantially similar to his trial testimony with the exceptions that he stated Williams had called him after the second incident, he thought it was a three-day weekend but was "not sure[,]" his penis became erect during the second incident, and that he did not want Williams to go to jail.

Kaʻai-Barrett testified that Williams was a volunteer for the Hawaii Youth Opera Chorus; that two adults would always be present with groups of children; and that there were never reports of Williams acting inappropriately with children. On cross-examination, Kaʻai-Barrett agreed that she had never been to the Williamses' home; the events were held in public; and someone "sucking a child's penis is not something you would expect to see in public[.]"

A.B. testified that T.Y. would intrude into her and J.W.'s time together; and that T.Y. was trying to hang out with J.W. at the beach house. On cross-examination, A.B. acknowledged that T.Y. would just want to play with them; and that there were many people at the beach house. The DPA questioned A.B. about whether "sucking a child's penis is not something you would expect to see in public[.]" Williams objected and the court deemed the question beyond the scope of direct examination.

Morgan testified that she met T.Y. and played a game of cribbage with him at the beach house; she described T.Y. as "very arrogant and rude and disrespectful[,]" and she quit playing with him. On cross-examination, Morgan agreed there were many people at the beach house and that "sucking a child's penis is not

something you'd expect to see in public[.]"   Williams did not object.   Williams rested.

During closing arguments, Williams did not object to any of the DPA's statements.   The DPA objected nine times during Williams's closing, five of which were sustained.   After approximately two hours of deliberation, the jury found Williams guilty on all counts.

On May 16, 2016, Williams moved for a judgment of acquittal or a new trial.   The bases for the motion were that there was insufficient evidence and prosecutorial misconduct.  At the June 29, 2016 hearing, Williams added to the motion a complaint that Dr. Bivens's testimony was too broad under State v. Kony, 138 Hawai'i 1, 375 P.3d 1239 (2016).   The court heard from both parties and denied the motion.

II.

## A.   **Prosecutorial Misconduct**

Williams generally alleges the DPA "committed multiple, continuing, and egregious acts of misconduct throughout the course of the trial and especially during closing argument that violated his constitutional right to a fair trial." Specifically, Williams alleges the DPA failed to disclose expert materials or witness statements during discovery, referenced out-of-court statements during trial, made improper closing arguments, and made frivolous objections during his closing argument.[5]

> When the prosecutor's conduct is deemed improper, this court must then consider whether such conduct constitutes reversible error.   "Prosecutorial misconduct warrants a new trial or the setting aside of a guilty verdict only where the actions of the prosecutor have caused prejudice to the defendant's right to a fair trial."   State v. Clark, 83 Hawai'i 289, 304, 926 P.2d 194, 209 [1996] (quoting State v. McGriff, 76 Hawai'i 148, 158, 871 P.2d 782, 792 (1994)[]). . . .   In order to determine whether the deputy prosecutor's remark amounted to reversible error, the reviewing court considers: (1) the nature of the misconduct; (2) the promptness of a curative instruction or lack of it; and (3) the strength or weakness of the evidence against the defendant.   Id.

---

[5]      In addition, Williams argues for the first time in his Reply Brief that "cumulative effect of the deputy prosecuting attorney's misconduct so infected the trial of Mr. Williams that his substantial rights were affected and warrant a new trial[.]"

State v. Mara, 98 Hawai'i 1, 16-17, 41 P.3d 157, 172-73 (2002).

Error is deemed harmful "[i]f there is a reasonable possibility that error might have contributed to a conviction in a criminal case, then the error cannot be harmless beyond a reasonable doubt, and the conviction must be set aside." State v. Klinge, 92 Hawai'i 577, 583, 994 P.2d 509, 515 (2000) (citation omitted).

1.    **Discovery**

Williams claims the State committed prosecutorial misconduct by failing to disclose materials within the DPA's possession. Williams argues the State committed three violations of discovery by failing to produce: (1) a computerized statement or report by T.Y. to S.S. regarding his disclosure of the abuse; (2) evidence of an alleged conversation between Williams and Father; and (3) Dr. Bivens's reports or statements made in connection with this particular case.

The prosecution has a duty "to seek justice, to exercise the highest good faith in the interest of the public and to avoid even the appearance of unfair advantage over the accused." State v. Moriwaki, 71 Haw. 347, 354, 791 P.2d 392, 396 (1990) (citation and internal quotation marks omitted). Accordingly, Hawai'i Rules of Penal Procedure (HRPP) Rule 16(b)(1) requires disclosure of "the following material within the prosecutor's possession or control":

> (i) the names and last known addresses of persons whom the prosecutor intends to call as witnesses in the presentation of the evidence in chief, together with any relevant written or recorded statements, provided that statements recorded by the prosecutor shall not be subject to disclosure;

> (ii) any written or recorded statements and the substance of any oral statements made by the defendant, or made by a co-defendant if intended to be used in a joint trial, together with the names and last known addresses of persons who witnessed the making of such statements;

> (iii) any reports or statements of experts, which were made in connection with the particular case or which the prosecutor intends to introduce, or which are material to the preparation of the defense and are specifically designated in writing by defense counsel, including results of physical or mental examinations and of scientific tests, experiments, or comparisons[.]

HRPP Rule 16(b)(1).

### a. **T.Y.'s Statement to S.S.**

Williams asserts "the prosecutor adduced evidence of a computerized statement or report by T.Y. to [S.S.] that had never previously been disclosed during prolonged pretrial proceedings." T.Y. disclosed to S.S., by typing in a computer program, reasons --including the alleged abuse--why he was no longer friends with J.W. HRPP Rule 16(b)(1)(i) requires the prosecution's disclosure of any relevant written or recorded statements of witnesses it intends to call during its case-in-chief at trial, in its possession or control. Here, the record reflects that the State was not in possession of any written or recorded statements. As the DPA explained below, "And these instant messages, we don't have them because it disappeared, but I can have the witness explain the nature of the program that they were using at the time that--so I've never seen these messages. No one has them[.]" S.S. corroborated this statement in her trial testimony. Therefore, because the statement at issue was not within the prosecutor's possession or control, there was no Rule 16 violation for failure to provide these written statements to Williams, and thus no prosecutorial misconduct.

### b. **Williams's Statement to Father**

Williams argues the DPA adduced evidence of a conversation between Williams and Father without providing evidence of these statements in discovery. HRPP Rule 16(b)(1)(ii) requires production of written or oral statements of the defendant. Here, the prosecution denied having any written or recorded statements, but did not deny failing to disclose oral statements Williams made to Father. The Circuit Court barred the State from eliciting testimony regarding these statements but allowed testimony about the circumstances of the statements. Thus, the testimony presented was not of the substance of the conversation, and to the extent there was an HRPP Rule 16 violation, it was mitigated by the Circuit Court's refusal to take testimony stemming from the failure to disclose. Moreover, the defense admitted that Williams wanting to talk to Father about T.Y. was irrelevant. To the extent there was

prosecutorial misconduct the court's prompt prevention of the material being presented to the jury rendered it harmless.

### c. Dr. Bivens's Reports or Statements

Williams argues that the DPA violated HRPP Rule 16(1)(iii) by failing to provide him with statements or reports from Dr. Bivens. However, as Dr. Bivens's trial testimony indicates, he had no information about the specifics of the case, only knew T.Y.'s gender and general age, and had no notes or files related to this case. Here, Williams points to no instance of matters relating to this case that were withheld to his material detriment. Therefore, because there was no HRPP Rule 16 violation, there was no prosecutorial misconduct.

### 2. During Trial

### a. Cross-Examination of Williams's Witnesses

Williams argues the DPA engaged in improper cross-examination when the DPA "inexplicably asked [defense witnesses] if they think it 'is ok to suck someone's dick.'" While Williams misstates the question, the DPA did ask variations on the question, "sucking a child's penis is not something you would expect to see in public; right?" In the first instance, the DPA's question was not objected to and was asked of Kaʻai-Barrett in the context of Williams's conduct as a volunteer around the children of the Hawaii Youth Opera Chorus. Far from being inexplicable, the question was meant to show that the witness would be ignorant of any abuse by Williams because such abuse would not likely occur in public. In the second instance, the question was objected to and deemed beyond the scope presumably because A.B. testified to her relationship with J.W. and was not a comment on Williams. In the third instance, Williams did not object to the question and Morgan testified to her long relationship with Williams, which would have included the time at the beach house in public with children. Thus, the questions, with one exception, drew out the point that the witnesses would not have personal knowledge of private abuse of a kind involved in one of the counts and was not prosecutorial misconduct.

### b.    Closing Arguments

Williams contends the DPA committed three instances of prosecutorial misconduct in closing arguments, that the DPA argued that Williams's witnesses were not credible and had collaborated on their testimony; imputed a homophobic bias to Williams and his counsel; and frequently objected during Williams's counsel's closing argument.

### i.    Improper Comment on Credibility

Williams asserts the DPA twice improperly accused him "of delaying the trial for two years while the witnesses conspired and collaborated to present false testimony." It is well-established that the prosecutor may not express personal views as to the credibility of defense witnesses, but has wide latitude to draw inferences from the evidence, including that defense witnesses are lying. Compare State v. Basham, 132 Hawai'i 97, 115, 319 P.3d 1105, 1123 (2014) (prosecutors are bound to refrain from expressing personal views as to the credibility of witnesses) with State v. Cordeiro, 99 Hawai'i 390, 425, 56 P.3d 692, 727 (2002) (prosecuting attorney has wide latitude and may comment on the evidence and the credibility of witnesses). Here, Williams complains of two statements by the DPA. First, during closing argument:

> And remember, they've had 2 years. These witnesses told us when they found out about these allegations. The lady from the Hawaii Youth Opera found out when she bumped into this defendant. He told her, "I'm in a sticky situation." That was 2 years ago. They've had that much time to collaborate, to figure out what they were going to say when they came into court. And they're retaliating, they're blaming, they're trying to point the finger at [T.Y.] because they're upset.

And, second during rebuttal argument:

> Members of the jury, the defense had 2 years, 2 years to collaborate, to pick a date that fell outside of the range that follow a 3-day weekend to say that that was the weekend they went out to the beach house.

> Other than their word on that stand, the people that have a bias, interest, and motive for--to testify favorably for the defense, there is nothing to show that they actually went out to that beach house Presidents' Day weekend.

Despite Williams's assertions, absent from either statement is any indication that the DPA claimed Williams delayed the trial for the purpose of providing time to fabricate a story. Further,

like <u>Cordeiro</u>, Williams points to no place where the DPA is expressing a <u>personal opinion</u> of the witnesses' credibility. Instead, the allegations of untruthfulness are supported by reasonable inferences from the facts presented as evidence before the jury. The time that elapsed between charges and trial was a little over two years; the defense strategy was to portray T.Y. as vindictively fabricating charges; and Kathy and J.W. as family members do have bias, interest, or motive in testifying favorably for the defense and did both testify that T.Y. pet-sat over Presidents' Day weekend, which was outside the charged time period. Thus, while the DPA did comment on the evidence or reasonable inferences therefrom, she did not express a personal opinion as to the credibility of the defense witnesses.

### ii. **Allegation of Imputation of Bias**

Williams claims the DPA has "imputed an inexcusable and unjustified homophobic bias" to Williams for presenting his lack of prior interest in or sexual attraction to males. The DPA's statement was as follows:

> And the defense, <u>the hope of appealing to an ugly prejudice</u>. You know, some of the questions that came up, did he exhibit any homosexual tendencies or any inappropriate behavior with children, now that <u>ugly prejudice that the defense is trying to appeal to is that this crime could only be committed by someone who is a homosexual or likes children as a pedophile</u>, but under the law, there are no exceptions. That's not a criteria. That's not an element. This crime can be committed by anyone.

(Emphasis added).

Williams cites <u>State v. Basham</u> 132 Hawai'i 97, 112, 319 P.3d 1105, 1120 (2014) and <u>State v. Rogan</u>, 91 Hawai'i 405, 413, 984 P.2d 1231, 1239 (1999) for the proposition that prosecutors "should not use arguments calculated to inflame the passions or prejudices of the jury." (Quoting ABA Prosecution Function Standard 3-5.8(c) (3d ed. 1993).)

Here, the DPA is not appealing to discriminatory stereotypes but accusing Williams of trying to appeal to jurors' potentially preconceived bias that only men who are sexually attracted to men or to adolescent boys would sexually assault a boy, and attempting to dispel those biases and to consider Williams's sexual attractions as irrelevant to the charges.

19

Thus, the DPA cannot be said to have been attempting to appeal to jurors's biases in their determination of the facts, and did not commit prosecutorial misconduct.

### iii. The DPA's Objections During Williams's Closing

Williams argues that the DPA committed prosecutorial misconduct by "constantly objecting and interrupting defense counsel's closing argument[,]" and asserts "Few--if any--of her frequent objections had merit." Contrary to this assertion, during Williams's closing argument the DPA made nine objections; of those, five were sustained and four were overruled. Review of the record indicates the objections were not without basis as defense counsel sometimes attempted to argue matters not in evidence. Finally, Williams cites to no statutory or case law or basis to support his argument that this constitutes prosecutorial misconduct. Therefore, this argument is without merit.

### 3. The Cumulative Effect

Williams in his Reply Brief further argues that the cumulative effect of all these instances of prosecutorial misconduct deprived him of a fair trial. The supreme court has held, "[a]lthough no single instance of prosecutorial misconduct substantially prejudiced appellants' right to a fair trial, we find that the cumulative weight of the prosecutor's improper conduct was so prejudicial as to deny appellants a fair trial." State v. Soares, 72 Haw. 278, 283, 815 P.2d 428, 431 (1991).

Here, while Williams makes numerous allegations of misconduct, we find all but one have no merit, and the DPA's failure to disclose a conversation between Williams and Father, which the Circuit Court excluded, was harmless. Therefore, there was not "an atmosphere of bias and prejudice which no remarks by the trial court could erase." Id. at 283, 815 P.2d at 431. The cumulative effect of alleged prosecutorial misconduct did not deprive Williams of a fair trial.

### B. The Circuit Court Did Not Permit Testimony of Previously Excluded Out-of-Court Statements

Williams argues that the Circuit Court erred by allowing the testimony of prior out-of-court statements by T.Y.

to S.S. and C.O. where the court expressed a pre-trial inclination to exclude. Williams challenges testimonial references to the computer message by S.S., and Father's references to a conversation between Williams and Father.[6]

### 1. Computerized Statement from T.Y. to S.S.

Williams contends the Circuit Court erred by permitting references to an out-of-court statement made by T.Y. to S.S.:[7] Specifically, the computer message sent from T.Y. to S.S. that explained why he no longer spent time with J.W.

While the court initially struck the reference to the computer statement made by DPA in its opening statement, the State later examined S.S. and developed this point further:

> [DPA]: Did you ever have a chance to talk to [T.Y.] about this?
>
> [S.S.]: Actually, yeah. I think around ninth grade or something like that I started hanging out with him more after he started being a little bit more of a hermit, and I was a little worried about him because it was just a weird change. So I started checking up on him more and trying to be more of a good friend for him since I stopped hanging out with him and [J.W.] after. But I asked him like why aren't you two hanging out anymore because you used to be together all the time, and he said--
>
> [Williams's Counsel]: Objection; hearsay.
>
> THE COURT: Sustained.
>
> [DPA]: Okay. Your Honor, if we may approach?

---

[6] Williams also points to references to these statements made by DPA during opening statement. The DPA did not relate the actual statements, but told the jury that T.Y. "talk[ed] to two friends," made references to, but did not quote, a computer message sent by T.Y. to S.S., which was stricken, and stated that "[T.Y.'s] parents, his teachers, his friends, they will invite you to listen as they tell you about what this man did to [T.Y.]"

Further, as the Circuit Court admonished the jury, "[o]pening statement is not evidence," any lingering prejudicial effect was cured by the court's instructions to the jury. The jury is presumed to have followed the court's instructions. State v. Deguair, 139 Hawai'i 117, 127, 384 P.3d 893, 903 (2016) (citing State v. Knight, 80 Hawai'i 318, 327, 909 P.2d 1133, 1142 (1996)) ("[A]s a rule, juries are presumed to . . . follow all of the trial court's instructions.") In addition, the jury was instructed, "Statements or arguments made by lawyers are not evidence. You should consider their arguments to you, but you are not bound by their memory or interpretation of the evidence."

[7] To the extent that Williams's argument is that this is a statement within the meaning of HRE Rule 613(c), prior consistent statements of a witness, it is incorrect. S.S. described her present sense impression of T.Y.'s emotional state and his act of typing the message, and was not a statement within the definition of "statement" under HRE Rule 801. ("An oral assertion, an assertion in a writing, or nonverbal conduct of a person, if it is intended by the person as an assertion.")

21

THE COURT: Yes. (Bench conference.)

[DPA]: Your Honor, it's not hearsay. It's not being offered for the truth of the matter asserted. It's being offered to explain--[S.S.] had asked [T.Y.] because she observed this change in his relationship with [J.W.], and it goes to show on the part of the complaining witness, because his credibility is at issue, it's not something that he's making up, that, you know, these--this change, his emotions are real. It's not the emotions of someone that's fabricating a story.

THE COURT: What do you expect the answer to be? She asked him what's happening.

[DPA]: Right. And so he--he wasn't able to verbalize what happened to him, so instead he just typed it on the computer. And these instant messages, we don't have them because it disappeared, but I can have the witness explain the nature of the program that they were using at the time that--so I've never seen these messages. No one has them, the disclosure, so I'm not going to go into specifically what [T.Y.] wrote but just that she did--this is the way in which she learned about what happened to him, which also goes to explain the changes that she observed in [T.Y.].

THE COURT: Okay. She has to--why are you being so--a hermit, essentially?

[DPA]: Right.

THE COURT: But he wouldn't answer, it's just that he typed something on the computer?

[DPA]: Exactly, your Honor.

THE COURT: And that's as far as it's going to go because I think the defense said they never got a copy of the computer message.

[DPA]: We don't have a copy either, your Honor. These messages don't exist anymore.

THE COURT: Right.

[DPA]: But the witness can explain the computer, the program that they were using to communicate. I won't have her go into specifically what she read but just that this was the method in which she learned about what happened to [T.Y.].

THE COURT: All right.

[Williams's Counsel]: I think what you previously said is the limit to which they can go. We had no idea about any of this. It was never disclosed to us. If the prosecutor knew about it, she had a duty to tell us. It certainly does get into contents, and I think that they were obligated to produce them.

THE COURT: Well, the objection--I think what the defense is saying, they continue to object. So I'll let you ask her, I asked him about it, and he didn't answer me and he typed something. That's it. Okay?

[DPA]: Okay.

[Williams's Counsel]: Thank you. (End bench conference.)

As Williams points out, the Circuit Court's original ruling was, "Unless the government can come up with a hearsay exception, we litigate the matter outside the presence of the jury, but generally I'm not going allow it." The court thus indicated that its prohibition on testimony regarding T.Y.'s disclosure to his friends was open to further argument. The court took such argument and ultimately decided to permit the testimony referencing the statements, but not providing the statements themselves, for the limited purpose of explaining T.Y.'s lack of composure. Following this ruling, S.S. was questioned as follows:

> [DPA]: So, [S.S.], you mentioned that you did ask [T.Y.] about this sudden change in his relationship and hanging out with [J.W.]. Without telling us exactly what he wrote, if you can describe at that time [T.Y.]'s emotional state when you first asked him this question.
>
> [S.S.]: I specifically remember him having this sort of distant stare and just recalling it, and immediately when he started thinking about it, he turned around, and he didn't want me to see it. But he didn't want to tell me at first, so I kept pestering him. And eventually he told me to go on this messenger app called Recall. It doesn't work anymore because they closed down the program, but basically he had to type to me through this messenger app when I'm standing right behind him and receiving the messages through my own computer because he couldn't physically talk to me about it. And he would tell me the story through that, and I could just feel the atmosphere around us. It was so heavy and dark, and he didn't say a word for at least ten minutes after he wrote everything out. And it just felt so silent while he was typing away, and after he was done and after that--those really long ten minutes, that's the time when he like looked at me. And I could tell that he had been tearing up, and it was an emotional experience to recall for him. And his voice was a little shaky, and it was--he was trying really hard to be tough and trying not to show me what he was going through, and he purposely tried to hide those feelings because he didn't want me to be so worried like I was.
>
> [DPA]: After that night when you and [T.Y.] were both sitting at your computers, did you have an idea of who was involved and what had happened to [T.Y.]?
>
> [S.S.]: Yes. Well, he specifically told me what happened, so I was just--I couldn't really take in all the information because it just didn't seem like it happened. Like, I couldn't believe it, but I--I know that he wasn't lying, obviously. He would tell me the truth. And it was just bizarre that he wouldn't like talk to [J.W.], and that made a lot of sense after that.

The transcript thus reflects that the witness's reaction to the substance of the message is present in testimony but not the words of the statement itself. Thus, the Circuit Court did not

23

err as it did not allow hearsay testimony. See State v. Ortiz, 91 Hawai'i 181, 189-90, 981 P.2d 1127, 1135-36 (1999) (hearsay testimony under right/wrong standard).

### 2. Father's Conversation With Williams

Williams argues the Circuit Court erred in permitting Father to testify as to a conversation during a car ride with Williams. Father testified that Williams asked him to check out a roofing job at his beach house. Williams insisted on riding with Father, which struck Father as odd. Father testified, "So we got down to the house, and all the way down all he could talk about was [T.Y.]." To which Williams objected, and the court ruled it would be an HRPP Rule 16 violation for the failure to disclose the statement in discovery. The DPA presented reasons why the statement should be permitted, which the court rejected. The statements themselves were not presented to the jury. Father then testified that there was not any work to do on the roof, and that he believed Williams just wanted to take a ride with him. Thus, the Circuit Court did not err as it did not permit the forbidden statements before the jury.

### C. The Circuit Court Did Not Err in Admitting the Expert Testimony of Dr. Bivens

Williams contends the Circuit Court erred in permitting Dr. Bivens's testimony. Whether or not expert testimony will be permitted is an inquiry made under HRE Rule 702[8] and is reviewed for abuse of discretion. Larsen v. State Sav. & Loan Ass'n, 64 Haw. 302, 304, 640 P.2d 286, 288 (1982). Expert testimony assists the trier of fact by providing "a resource for ascertaining truth in relevant areas outside the ken of ordinary laity." State v. Batangan, 71 Haw. 552, 556, 799 P.2d 48, 51 (1990) (citations omitted). Under Batangan, to admit expert

---

[8] HRE Rule 702 states:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise. In determining the issue of assistance to the trier of fact, the court may consider the trustworthiness and validity of the scientific technique or mode of analysis employed by the proffered expert.

24

testimony the trial court must be satisfied the witness is (1) an expert, (2) the testimony is relevant, (3) the testimony must be shown to assist the jury to comprehend something not commonly known or understood, and (4) experts may not give opinions which in effect usurp the basic function of the jury. Id. at 562, 799 P.2d at 54.

### 1. Dr. Bivens Is an Expert

The court must be satisfied the witness is an expert. Id. To certify a witness an expert, the trial court must determine the expert has "such skill, knowledge, or experience in the field in question as to make it appear that his opinion or inference-drawing would probably aid the trier of fact in arriving at the truth." State v. Wallace, 80 Hawai'i 382, 418 n.37, 910 P.2d 695, 731 n.37 (1996). Here, prior to Dr. Bivens's certification as an expert, Dr. Bivens's credentials and experience in the field of child sexual abuse, clinical experience, lectures and training he has conducted, honors and awards, continuing education, and prior testimony was presented to the court. Williams did not object to his certification as "an expert in clinical psychology with an emphasis on the dynamics of child sexual abuse." Williams further argues that no foundation was laid for Dr. Bivens's testimony as to children T.Y.'s age, as required by the court. However, Dr. Bivens testified that most of his seventy-five clients are between the ages of thirteen and nineteen, and that he was informed of T.Y.'s gender and general age. Dr. Bivens also testified as to clinical reasons male children might delay reporting. Further, Dr. Bivens has been called to testify frequently on the subject of the sexual abuse of children, and in particular, on the dynamics of child sexual abuse, including the phenomena of delayed reporting. See Kony, 138 Hawai'i at 9, 375 P.3d at 1247; State v. McDonnell, 134 Hawai'i 475, 344 P.3d 359, No. CAAP-14-0000355, 2015 WL 405720, at *4 (App. Jan. 31, 2015) (SDO); State v. Behrendt, 121 Hawai'i 260, 218 P.3d 387, No. 29191, 2009 WL 3653563, at *2 (App. Nov. 4, 2009) (SDO), aff'd 124 Hawai'i 90, 237 P.3d 1156 (2010); State v. Moisa, 126 Hawai'i 266, 269 P.3d 801, No. 30712, 2012 WL 247963, at *4 (App. Jan. 25, 2012) (SDO); State v.

Pacheco, 128 Hawai'i 477, 290 P.3d 547, No. CAAP-11-0000571, 2012 WL 5990275, at *2-3 (App. Nov. 30, 2012) (SDO); State v. Transfiguracion, 128 Hawai'i 476, 290 P.3d 546, No. CAAP-11-0000048, 2012 WL 5897413 (App. Nov. 21, 2012) (SDO). In all of these cases, this court has held that the expert testimony of Dr. Bivens on the subject of reactions of child victims to child abuse was not categorically improper. Therefore, the Circuit Court did not abuse its discretion in finding that Dr. Bivens is an expert.

2. **Dr. Bivens's Testimony Was Relevant and Was Shown to Assist the Jury**

The trial court must be satisfied that the testimony is relevant and shown to assist the jury to comprehend something not commonly known or understood. Batangan, 71 Haw. at 562, 799 P.2d at 54. In Kony the supreme court has reaffirmed delayed reporting is not commonly understood. 138 Hawai'i at 9, 375 P.3d at 1247. Williams argues that Dr. Bivens's testimony was irrelevant because delayed disclosure was not at issue in this case. In Kony, the supreme court found the trial court did not abuse its discretion in permitting Dr. Bivens's testimony because it was relevant to explain delayed reporting where the delay was about three months, measured from the date of the first incident. Id. at 4, 9, 375 P.3d at 1242, 1247. There, it appears that the complaining witness also disclosed to a cousin "'[w]hile it was happening.'" However, this disclosure does not appear to have affected the supreme court's analysis of when disclosure occurred for the purpose of determining the relevance of Dr. Bivens's testimony. Id. at 4, 375 P.3d at 1242.

Williams asserts delayed disclosure was not at issue here because:

> T.Y. was "talking about these events" to "other kids" "within months" of the alleged event. [S.S.] testified that T.Y. disclosed the alleged incident to her in 2012, sometime during her ninth grade year. And [C.O.], a Hawaii Baptist Academy camp counselor in 2013, testified that T.Y. reported the incident to him "during Christian Emphasis Week" "sometime in 2012 or 2013." Accordingly, delayed disclosure was never an issue insofar as T.Y. previously had disclosed the incident to [S.S.] sometime in 2012, and again to [C.O.] in 2013.

Thus applying <u>Kony</u>, the time frame of "within months" was sufficient in order to make Dr. Bivens's testimony regarding delayed disclosure relevant to T.Y.  Moreover, the court specifically responded to Williams's contention that there was not delayed disclosure stating,

> people expect that if you're supposedly touched, you turn around, you run home, and you say, Mom, you know what somebody did to me?  That would be immediate reporting. Waiting a day, waiting a week, waiting a year, I mean, I think to the prosecution, anyway, because they think maybe to the jury that is delayed reporting and hence it didn't happen.

The court specifically found, and the record supports that there was delayed reporting prior to permitting Dr. Bivens to testify. Therefore, the court did not abuse its discretion.

### 3. Dr. Bivens Did Not Give Opinions Which in Effect Usurped the Basic Function of the Jury

The trial court must not allow experts to give opinions which in effect usurp the basic function of the jury.  <u>Batangan</u>, 71 Haw. at 562, 799 P.2d at 54.  "The pertinent consideration is whether the expert testimony will assist the jury without unduly prejudicing the defendant."  <u>Id.</u> at 558, 799 P.2d at 52.  The HRE Rule 403 determination of whether unfair prejudice occurred usurping the basic function of the jury is left to the discretion of the trial court, and is only reviewed here for an abuse of that discretion.  <u>Pacheco</u>, 2012 WL 5990275 at *1 (quoting <u>Kaeo v. Davis</u>, 68 Haw. 447, 454, 719 P.2d 387, 392 (1986)).

Williams argues that Dr. Bivens's testimony improperly bolstered T.Y.'s credibility.  Williams does not claim and the record does not support the notion that Dr. Bivens explicitly stated that he believed the abuse occurred or that T.Y. delayed disclosure.  Williams asserts, "witness testimony had little or nothing to do with delayed disclosure and was intended only to provide some apparent--and virtually concocted--corroboration for T.Y.'s testimony[.]"  It is understood that even though "this type of expert testimony carries the potential of bolstering the credibility of one witness and conversely refuting the credibility of another, . . . [s]uch testimony, by itself, does not render the evidence inadmissible."  <u>Batangan</u>, 71 Haw. at 558, 799 P.2d at 52.  In <u>Batangan</u>, the State's expert witness actually

27

evaluated the complainant, so testimony about his evaluation of whether a child is telling the truth could more clearly be interpreted as implicit testimony that complainant herself was believable and had in fact been abused by the defendant. Id. at 555, 799 P.2d at 50. The Hawai'i Supreme Court held that "conclusory opinions that abuse did occur and that the child victim's report of abuse is truthful and believable is not of assistance to the jury, and therefore should not be admitted." Id. at 558, 799 P.2d at 52.

Here, it is important to note that in direct contrast to Batangan and to avoid the appearance of bolstering, Dr. Bivens made it a point to clearly state that he had no information about the specifics of the case and only knew T.Y.'s gender and general age. Further, Dr. Bivens testified that psychological assessment could not determine with any degree of certainty whether abuse occurred. We previously addressed the situation where expert testimony given by Dr. Bivens was claimed to have improperly bolstered the testimony of the complaining witness, and have found no impropriety where the defendant "cites to no evidence that Dr. Bivens offered an opinion regarding [the complaining witness] or that Dr. Bivens's testimony served to improperly bolster [the complaining witness's] credibility." Moisa, 2012 WL 247963 at *2 (brackets added); see also Pacheco, 2012 WL 5990275, at *1 ("Dr. Bivens did not opine on the credibility of Child and testified that he did not know the particulars of, nor was he given evidence pertaining to, this case"); Transfiguracion, 2012 WL 5897413, at *2 ("Transfiguracion does not identify any place in the record in which Dr. Bivens testified about this particular case").

Williams fails to point to evidence illustrating that Dr. Bivens's testimony served to improperly bolster T.Y.'s credibility. Proper expert witness testimony requires a balance between offering information that is specific enough to be relevant and helpful to the jury while at the same time being generalized to the extent that it does not directly opine on the credibility of the complaining witness. The trial court is in the best position to make this determination, and we cannot say

that the Circuit Court abused its discretion in permitting Dr. Bivens's testimony.

D.   **The Circuit Court Did Not Err in Denying Williams's Motion for Judgment of Acquittal and Post-Trial Motion for a New Trial**

Williams contends the Circuit Court erred by denying his Motion for Judgment of Acquittal at the end of the State's case and his post-trial Motion for a New Trial or Acquittal. Williams asserts the State failed to present sufficient evidence of sufficient quality and probative value to enable a person of reasonable caution to conclude that the offense occurred within the alleged dates and thus, the jury could not reasonably presume or infer that the offenses occurred at the times alleged without any evidentiary basis.

"It is well established, as a precept of constitutional as well as statutory law, that an accused in a criminal case can only be convicted upon proof by the prosecution of every [material] element of the crime charged beyond a reasonable doubt." State v. Jenkins, 93 Hawai'i 87, 108, 997 P.2d 13, 34 (2000) (brackets in original) (quoting State v. Wallace, 80 Hawai'i 382, 406, 910 P.2d 695, 719 (1996) (citations and internal quotations omitted)). However, in State v. Arceo, the supreme court noted "[i]n general, the precise time and date of the commission of an offense is not regarded as a material element" 84 Hawai'i 1, 13, 928 P.2d 843, 855 (1996).

In Arceo, the supreme court endorsed the California Supreme Court's paradigm for considering the sufficiency of a child's sexual abuse testimony:

> [T]he particular details surrounding a child molestation charge are not elements of the offense and are unnecessary to sustain a conviction.
>
> The victim, of course, must describe the kind of act or acts committed with sufficient specificity, both to assure that unlawful conduct indeed has occurred and to differentiate between the various types of proscribed conduct (e.g. lewd conduct, intercourse, oral copulation or sodomy). Moreover, the victim must describe the number of acts committed with sufficient certainty to support each of the counts alleged in the information or indictment (e.g., "twice a month" or "every time we went camping"). Finally, the victim must be able to describe the general time period in which these acts occurred (e.g., "the summer before my fourth grade," or "during each Sunday morning after he came to live with us") to assure the acts were committed within

> the applicable limitation period.  Additional details regarding the time, place or circumstance of the various assaults may assist in assessing the credibility or substantiality of the victim's testimony, but are not essential to sustain a conviction.

84 Hawai'i at 13, 928 P.2d at 855 (quoting People v. Jones, 792 P.2d 643, 655-56 (Cal. 1990)).

> In an indictment[,] the offense . . . may be stated with so much detail of time, place, and circumstances and such particulars . . . as are necessary to identify the transaction, to bring it within the statutory definition of the offense charged, to show that the court has jurisdiction, and to give the accused reasonable notice of the facts.

Id. (quoting HRS § 806-34 (1993) (emphasis, ellipses, and modification in original)).  "[T]he information need only be specific enough to enable the defendant to prepare his defense and to protect him from being subsequently prosecuted for the same offense."  Id. at 14, 928 P.2d at 856 (quoting State v. Roberts, 610 P.2d 558, 559 (Idaho 1980)).  Sufficiency of evidence is reviewed in the light most favorable to the State v. Timoteo, 87 Hawai'i 108, 112, 952 P.2d 865, 869 (1997).

At trial, Williams was charged with one count of SA One and three counts of SA Three from two separate incidents.

## 1. **First Alleged Incident**

In Count 4, Williams was charged with having committed the offense during the period of March 9 through March 26, 2012. At trial, T.Y. placed the first incident of abuse within his 2012 spring break.  T.Y. testified that he believed it was during spring break because he would be more likely to stay over at the Williamses' home.  Detective Sato obtained the dates of the 2012 spring break--March 9 through March 26, 2012--by consulting the school calendar.  Reviewed in the light most favorable to the State, this provides sufficient evidence to fix the date of the first incident within the charged period of time.  T.Y.'s description of when the first incident occurred is sufficient within the paradigm quoted by the supreme court in Arceo, that "victim must be able to describe the general time period in which these acts occurred (e.g., 'the summer before my fourth grade,' or 'during each Sunday morning after he came to live with us)[.]'"  84 Hawai'i at 13, 928 P.2d at 855 (quoting Jones, 792

P.2d at 655)'. Thus, there was sufficient evidence to prove this offense as charged.

## 2. Second Alleged Incident

In Counts 1 through 3, Williams was charged with having committed the respective offenses between May 1 and June 11, 2012. At trial, the time of the second incident was described by reference to the first incident. T.Y. testified that it was after the first incident on a three-day weekend. On cross-examination, T.Y. acknowledged the second incident could have been in April, May, or June, but not in July. Detective Sato testified that T.Y. remembered the second incident as being "a few months after that spring break in 2012." Detective Sato determined that there were three three-day weekends after spring break 2012; Good Friday, Memorial Day, and Kamehameha Day. On cross-examination, Detective Sato narrowed the possible three-day weekend by eliminating Good Friday because it was too soon after spring break.

In addition, Father testified that he had noted two shifts in T.Y.'s behavior, the first when he stopped spending time with the Williams family. Although T.Y. started spending time with the Williams family again after four to six weeks, he then retreated into his room and barely ate.

T.Y.'s description of when the second incident occurred is sufficient within the paradigm quoted by the supreme court in Arceo, that the "victim must be able to describe the general time period in which these acts occurred." 84 Hawai'i at 13, 928 P.2d at 855 (quoting Jones, 792 P.2d at 655). The want of more specific evidence goes to "assessing the credibility or substantiality of the victim's testimony." Id.

Williams further asserts that Kathy testified that T.Y. looked after their pets on Presidents' Day weekend which would be inconsistent with T.Y.'s testimony and Kathy's testimony was not contradicted or impeached. However, this court does not make credibility determinations or weigh the evidence. State v. Mitchell, 94 Hawai'i 388, 393, 15 P.3d 314, 319 (App. 2000); State v. Hopkins, 60 Haw. 540, 542, 592 P.2d 810, 812 (1979) (holding that the trier of fact may accept or reject any

witness's testimony in whole or in part). Thus, considering all the evidence in the light most favorable to the State, there was sufficient evidence the incident occurred within the charged period.

In regards to the post-trial motion for a new trial, Williams played Defense Exhibit A, the video recording of T.Y.'s interview with Detective Sato. In the video, T.Y. was asked "What about the second incident when you went to pet sit, when do you think that was?" T.Y. replied "it was usually a three day weekend when they went out [to the beach house], so some three day weekend probably, but I'm not completely sure." Following up, Detective Sato asked, "Do you remember if it was after spring break, like right after spring break?" T.Y. replied, "I think a few months maybe." Sato pressed, "a few months, but still during, what grade were you in?" T.Y. answered, "I--pretty sure I was still in eighth grade." Thus, a review of all the evidence in the light most favorable to the State reveals that there was sufficient evidence the incident occurred within the charged period.

As there was sufficient evidence that the two incidents occurred within their respective charged periods the Circuit Court did not err in denying Williams's Motion for Judgment of Acquittal and post-trial Motion for a New Trial.

**E.** **The Circuit Court Did Not Abuse Its Discretion in Limiting the Number of Witnesses to Testify to Williams's Character**

Williams claims the Circuit Court erred by restricting the number of witnesses that he was permitted to call to attest to his excellent character, reputation, and lack of propensity to commit the alleged offenses. Specifically, Williams contends that by restricting the number of defense witnesses and the scope of character and reputation testimony, the trial court seriously abused its discretion so that the core issues of credibility could not fully be presented for the triers of fact.

Whether evidence will be admitted is governed by the Hawaii Rules of Evidence (HRE). HRE Rule 403 provides,

> **Exclusion of relevant evidence on grounds of prejudice, confusion, or waste of time.**

> Although relevant, evidence may be excluded if its probative
> value is substantially outweighed by the danger of unfair
> prejudice, confusion of the issues, or misleading the jury,
> or by considerations of undue delay, waste of time, or
> needless presentation of cumulative evidence.

Here, the State objected and the court was concerned that the evidence proffered was cumulative. In order for evidence to be considered "cumulative" for HRE 403 purposes, it must be substantially the same as other evidence that has already been received. State v. Pulse, 83 Hawai'i 229, 247, 925 P.2d 797, 815 (1996) (citations omitted).

Williams's defense was that the alleged offenses did not occur, that T.Y. was not credible and that the allegations were motivated by personal feelings of jealousy against J.W. To support this defense, Williams sought to introduce eleven witnesses, to show both T.Y.'s motivations and Williams's good character. Williams was permitted to present seven of the eleven witnesses he initially proposed. Kathy testified, *inter alia*, that Williams had never been reported to act inappropriately with children, they had many children in their home, Williams had never shown interest in adolescent boys, and Williams had not been violent or aggressive. J.W. testified, *inter alia*, that T.Y. was not happy about being separated from her at the beach house, T.Y. argued with her and with her aunty at the beach house, and her father had not acted inappropriately toward her and was not violent.

Of the remaining witnesses, Williams sought to further develop that T.Y.'s separation from J.W. at the beach house made him angry which caused him to lash out, triggered the end of their friendship, and eventually led to his fabricating the allegations. On this issue, the court permitted Joshua, A.B., and Morgan to testify to the events at the beach house. Williams also sought to introduce further evidence that he had access to children and there were no indications or reports of sexual abuse through Joshua, T.H-S, K.T., and Ka'ai-Barrett. The court stated that it was going to allow one person to testify about Williams being around children. Afterward, the court considered evidence on that point to be reaching cumulative, but also allowed Joshua to testify because he was a male in the home.

On appeal, Williams argues the Circuit Court committed plain error because he should have been permitted to have "a male non-family member" testify because the State would argue that Williams's family members are not telling the truth because they love him.  Williams made the bias argument to the court below, and the court stated it has an obligation to be "fair to everybody."  The evidence that Williams sought to introduce was substantially the same as the evidence offered by Joshua and Kaʻai-Barrett.  Further, the court stated, "I'm going to let one person testify to that, okay, so if you want to call the woman from the Hawaii Opera just to testify he's been around with kids and she knows him, no problem."  The court apparently gave Williams a choice about whom to call to testify about his proximity to children and Williams opted for Kaʻai-Barrett, a woman.  "An informed, tactical decision will rarely be second-guessed by judicial hindsight."  Briones v. State, 74 Haw. 442, 463, 848 P.2d 966, 977 (1993) (citing State v. McNulty, 60 Haw. 259, 270, 588 P.2d 438, 446 (1978) (decision to call witness is normally matter within the judgment of counsel)).

In light of the similarity of the proffered testimony, it was not an abuse of discretion to exclude the additional witnesses on the basis they were cumulative under HRE Rule 403.

**III.**

For the foregoing reasons the September 14, 2016 Judgment of Conviction and Sentence entered by the Circuit Court of the First Circuit is affirmed.

DATED:  Honolulu, Hawaiʻi, January 22, 2020.

On the briefs:

Eric A. Seitz
Della A Belatti
Sarah R. Devine
for Defendant-Appellant.


Sonja P. McCullen,
Deputy Prosecuting Attorney,
City and County of Honolulu,
for Plaintiff-Appellee.

Presiding Judge

Associate Judge

Associate Judge